ROBERT GLADWIN, Judge
The appellant, Connie Montigue, and the appellee, Donna Jones, are sisters. Their father, Freddie Graham, died in 2011. In 2013, Montigue, individually and as the personal representative of her father's estate, filed a petition for a declaratory judgment seeking to void several transfers of real and personal property that Mr. Graham made to Jones in the years and months before his death. Montigue alleged that Jones applied undue influence on her father, who, particularly in the months before his death, also lacked the mental capacity to execute the transfers. Jones filed a counterclaim for a judgment declaring that the transfers validly *50 extinguished any interest that Montigue had in her father's property.
After a bench trial, the circuit court granted Jones's motion for a directed verdict and entered a final order denying Montigue's petition for a declaratory judgment. The order also granted Jones's counterclaim. We reverse the circuit court's judgment and remand the case for further proceedings.[1]
I. Background Facts
Starting in 1997, Mr. Graham executed a series of documents that transferred, or purported to transfer, his twenty-three-acre property in Lavaca, Arkansas, to Jones. The first was a warranty deed that he executed on April 21, 1997. Mr. Graham purportedly transferred the property to Jones in exchange for "one dollar and other valuable consideration." There is no indication, however, that the deed was recorded.
Mr. Graham next executed a warranty deed on April 22, 2003. In exchange for one dollar, the deed purported to transfer the same twenty-three-acre property to himself and Jones as "joint tenants with right of survivorship, and not as tenants in common." Like the first, there is no indication that this deed was recorded.
A little over two years later, on October 5, 2005, Mr. Graham executed a beneficiary deed providing that the twenty-three-acre property would transfer to Jones at his death. Unlike the previous two deeds, the beneficiary deed was recorded the following day.
Mr. Jones followed the beneficiary deed with a last will and testament, which he executed on January 19, 2007. The document appointed Jones as the executor of Mr. Graham's estate, and it bequeathed "whatever vehicle [he] own[s] at the time of [his] death" to Jones. It also bequeathed various items of personal property to Jones's son, Brian, including Mr. Graham's John Deere tractor, a utility trailer, a four-wheel ATV, and "all guns which [he] own[s] at [his] death." Significantly, Mr. Graham also bequeathed
all the rest, residue and remainder of [his] estate, whether real, personal or mixed and wheresoever situated or to which [he] may in any way be entitled at the time of [his] death to [his] daughters, Donna R. Jones and Connie J. Montigue, to share and share alike equally among the two of them.
Mr. Graham also executed a declaration in which he acknowledged the prior beneficiary deed to Jones and stated the following:
The purpose of this [declaration] is to establish in writing that it is my desire that Donna R. Jones hold a $ 50,000.00 interest in said real property in trust for my daughter, Connie J. Montigue. That Donna R. Jones shall not be obligated to pay any sum or interest to Connie J. Montigue until such time as such real property is sold. Donna R. Jones is instructed that upon said property being sold that she is to pay to Connie J. Montigue the sum of $ 20,000.00 within a reasonable period of time after closing. That Donna R. Jones is directed to pay an additional $ 20,000.00 to Connie J. Montigue one (1) year thereafter. Donna *51 R. Jones is further instructed to pay the sum of $ 10,000.00 to Connie J. Montigue one (1) year thereafter for a total payment of $ 50,000.00 to Connie J. Montigue.
Mr. Graham apparently was hospitalized for a stomach infection on or about December 8, 2008. While hospitalized, he executed a durable power of attorney that appointed Jones as his attorney-in-fact. The power of attorney authorized Jones "to do any and all necessary acts concerning the management of [Mr. Graham's] estate," as well as "the right to approve or authorize medical treatment, surgery, the giving of medication, or other related health decisions."
The durable power of attorney was followed by a ratification that Mr. Graham and Jones executed on December 15, 2008. The ratification provides, in pertinent part, that
it is [Mr. Graham's] intent and that he has conferred with his daughter, Donna R. Jones, and that she understands that her ownership of [the twenty-three-acre property] by virtue of the Beneficiary Deed is subject to the terms of this Declaration and subject to the terms of the original declaration as ratified by this agreement and that she consents and agrees to the terms of the original Declaration of Freddy R. Graham in so far as it pertains to this particular real property and she agrees, understands, and ratifies the terms of this ratification of such declaration of Freddy R. Graham.
To-wit: Donna R. Jones shall be entitled to hold the real property for so long as she desires, but that in the event said real property is sold that she shall pay Connie J. Montigue the sum of $ 50,000.00.
Also on December 15, Mr. Graham executed a series of beneficiary deeds in Jones's favor that transferred minerals and mineral rights that he owned in Crawford, Sebastian, Logan, Johnson, and Franklin Counties.
Three years later, on March 3, 2011, Mr. Graham suffered a stroke and was hospitalized. Shortly thereafter, on March 11, Mr. Graham executed two bills of sale that transferred to Jones the personal property that he bequeathed in his will. Specifically, he signed documents that transferred his 2009 Chevrolet pick-up truck to Jones and his four-wheeler, tractor, guns, and crossbow to his grandson, Brian Jones.
After Mr. Graham's release from the hospital, on March 18, Jones filled out an application on his behalf for the Fountain of Youth adult day-care facility in Fort Smith. On the medical-history portion of the application, Jones explained that while Mr. Graham had not been diagnosed with dementia or Alzheimer's disease, he nonetheless had suffered a "mini stroke in the brain" that caused "cognitive issues ... and confusion." Jones wrote that Mr. Graham's mental state was such that he "[did] not converse a lot unless communicated with," and regarding Mr. Graham's abilities for verbal communication, Jones noted that the staff of the facility "might not get an answer relevant to the question." Jones also indicated that the staff of the facility needed to help Mr. Graham take his medication because he did not understand their names, purposes, dosages, or safety precautions. Jones further provided that the Fountain of Youth staff was not authorized to disclose Mr. Graham's health information to Montigue, Montigue's two daughters, or to Mr. Graham's ex-wife, Lila Cobb.
Finally, on April 4, 2011, Mr. Graham executed yet another deed regarding his twenty-three-acre property in Lavaca. In this warranty deed, Mr. Graham transferred title to the property to Jones in fee *52 simple, and he revoked "any Beneficiary Deed, any Declaration of Trust, or other document effecting (sic) title to [the] property."
Mr. Graham died on November 20, 2011. Montigue was appointed administrator of his estate on October 30, 2012. Almost a year later, on July 13, 2013, Montigue filed a petition for a declaratory judgment in which she alleged that an unexecuted 2005 draft of Mr. Graham's last will and testament established that Mr. Graham intended to divide all his property equally between his two daughters. Montigue further alleged that Mr. Graham and Jones were in a fiduciary relationship "under one or more powers of attorney," and after 2005, Mr. Jones signed "a number of instruments" while "acting under [Jones's] guidance and improper influence," resulting in "the conveyance of essentially all of the estate ... to Jones." According to Montigue, Mr. Graham's stroke in 2011 "[made] him even more dependent on [Jones] and [placed] her in an even stronger position of influence" when Mr. Graham executed the last warranty deed on April 4, 2011. For these reasons, Montigue sought a judgment declaring that
any interest [Mr. Graham] may have had in any real estate in 2005 which was subsequently conveyed to [Jones] in contradiction to the express intent of [Mr. Graham] that the property be divided equally between [Jones and Montigue] [was] void and that all of the real estate owned by [Mr. Graham] or which [Mr. Graham] had an interest in 2005 at the time the [unexecuted] will was drafted be declared to be a part of the probate estate herein.
Montigue amended her petition for a declaratory judgment on December 23, 2015, after discovering that Mr. Graham actually executed a will in 2007. In addition to a judgment declaring the property transfers void, Montigue sought an alternative judgment declaring that Jones holds title to the assets in trust and that Jones, according to Mr. Graham's testamentary intent, "should distribute one-half of such assets [and income] to herself and one-half ... to Montigue."
Jones filed a counterclaim for a declaratory judgment on March 21, 2016. Jones alleged that "[o]n or about April 21, 1997, [Mr. Graham] began finalizing his estate plan with a series of deeds, beneficiary deeds, will, declaration, ratification, power of attorney, and bill[s] of sale[.]" She asserted that Mr. Graham "intended to avoid probate if possible" and "engaged in significant efforts to plan his estate accordingly." Jones further alleged that Mr. Graham "already knew that [his twenty-three-acre] property would pass to [Jones] at the time of his death with [Montigue] having a monetary interest in the property if it was ever sold," and "the only reason" for Mr. Graham to execute the last warranty deed on April 4, 2011, was "to revoke any interest [Montigue] may have in the disputed property." Consequently, Jones requested a judgment quieting title to her and declaring that the warranty deed that Mr. Graham executed on April 4, 2011, extinguished Montigue's interest. Jones alternatively requested a judgment declaring that Montigue was entitled to only $ 50,000 after the sale of the property as Mr. Graham provided in the December 15, 2008 ratification.
Shortly before trial, Montigue filed a motion for partial summary judgment alleging that there was no genuine issue of material fact as to whether Jones and Mr. Graham were in a confidential relationship. Montigue's motion was principally based on Jones's admission, in her answer to Montigue's initial petition for a declaratory judgment, that she had power of attorney and "for several years acted in a fiduciary *53 relationship as an advisor to [Mr. Graham]." The circuit court denied the motion.
The case proceeded to a final hearing on September 19, 2017. On direct examination by Montigue's counsel, Jones testified that Mr. Graham was hospitalized for two days following his stroke on March 3, 2011. She "took him to [her] house" after he left the hospital, and he stayed in Jones's home for three weeks. Jones also acknowledged that she "had exclusive control" of her father at that time, including when she made the statements concerning Mr. Graham's diminished cognitive ability on the application for the Fountain of Youth. She further testified that she withheld authorization for the Fountain of Youth staff to share Mr. Graham's health information with Montigue, her daughters, and Ms. Cobb because Montigue and the others "never came around [or] cared about him anyway."
Jones thereafter testified about the circumstances surrounding Mr. Graham's execution of the last warranty deed on April 4, 2011:
Q. Where was the-was the Warranty Deed Prepared? What was the location?
A. It was in Greenwood, Arkansas, at the Walter Law Firm.
Q. Okay. And were you present when the deed was signed?
A. Yes.
Q. And prior to the signing of the Deed, did you discuss that Deed with your father?
A. There was a discussion between my father, me, and my sister.
Q. Okay. And when did that discussion take place?
A. The date before.
Q. Okay. That would be April 3rd?
A. Yes.
Q. Okay. And would you tell the Court what you stated and what your sister stated and what your father stated at that time on (sic) when you had that discussion we just referred to?
A. I was discussing with them the possibility of the property getting taken by the government.
....
Q. What did you say about the Deed, the preparation of the Deed?
A. That it needed to be transferred into my name, like it already was, to keep the government from getting it at the time of his death, whenever it may be.
Q. Now, did you call Bill Walters' office concerning that? The preparation of that Deed?
A. Yes. I called and talked to Bill.
Q. Okay. And then after you called Bill Walters' office, did you take your Dad to Bill Walters' office to sign the Deed?
A. Yes, we went over there.
Jones gave conflicting testimony, moreover, about the bills of sale that Mr. Graham executed on March 11, 2011. On direct examination by Montigue's counsel, Jones testified as follows:
Q. Now, did you pick up that Bill of Sale [regarding the four-wheeler, tractor, and guns] from Bill Walters' office at the same time that you picked up the Bill of Sale to the vehicle that you got to the Chevy pickup?
A. Yes.
Q. And did you take them to your father and ask him to sign them at the same time?
A. Yes.
*54 Q. Now, this was-let's see. March 3rd was when he had his stroke. Is that correct?
A. Correct.
Q. And he didn't call Bill Walters and ask him to prepare these Bill of Sales (sic) did he?
A. No, he did not.
Q. You did. Is that correct?
A. That's correct.
On cross-examination by her own counsel, however, Jones testified as follows:
Q. And there [were] some questions about these bill of sales (sic), how they got to your possession. Who told you to go get those?
A. Bill.
Q. Now, that was within seven days after your dad having a stroke, is that correct?
A. Correct.
Q. And Mr. Walters had gone up to the hospital?
A. Correct.
Q. Were you there when Mr. Walters and your dad spoke?
A. I was in and out. I can't be certain.
Q. But it wasn't you that called Mr. Walters and said, "Hey, I need you to prepare these bill of sales (sic)." Mr. Walters called you?
A. Correct. Correct.
Q. So your dad could have told Mr. Walters to prepare those?
A. Yes.
Jones also acknowledged that she had been "disturbed about [Mr. Graham] giving [Montigue] money over the years," particularly in the three or four years immediately preceding his death, when she claimed that Mr. Graham "kept coming to [her] house complaining" about giving money to Montigue. Jones testified that she called Mr. Graham's lawyer-Bill Walters-at one point because she "thought we should take him off of the account and [that she] should control the money," but she relented when Mr. Walters allegedly responded that "you can't tell a man how to spend his money." Jones denied making any suggestion that her father should transfer his property to her in order to protect his assets, but she testified that the last time Mr. Graham gave money to Montigue "was probably two weeks" before his stroke.
For her part, Montigue testified that she received financial assistance from her father over the years for items for her children, rent, and a down payment for a home. She also claimed that her father was generally quiet after his stroke, but "could definitely verbally express himself" when Jones allegedly tried "to get him to sign some paperwork" that he did not want to sign. Montigue also testified that she saw Jones "shoving papers in [Mr. Graham's] face [when] he didn't have his glasses" but denied having any personal knowledge of her father's signing any documents that he did not want to sign. She believed, however, that Jones exploited "cognitive issues" that Mr. Graham had before and after his stroke.
At the close of the petitioner's case, Montigue argued that the evidence demonstrated that Jones procured the bills of sale and the last warranty deed by "calling Bill Walters and requesting that he prepare [the] documents" and by "transporting [Mr. Graham] to sign [the] documents while she was present." According to Montigue, the procurement, along with the confidential relationship established by the power of attorney executed in 2008, warranted shifting the burden to Jones to produce evidence of both adequate mental capacity and the absence of undue influence.
*55 Jones responded that the evidence did not establish procurement because there was no indication that she used her power of attorney to execute any of the documents at issue. Jones also insisted that her conduct fell short of procurement because she merely acted as a courier-for both the documents and Mr. Graham himself-and he otherwise signed the documents of his own free will. Jones additionally argued that the burden would not shift even if the evidence demonstrated procurement because the documents at issue were deeds and bills of sale, rather than Mr. Graham's will. Jones moved for a directed verdict, therefore, because the burden of proof remained with Montigue, and according to Jones, Montigue failed to demonstrate undue influence or lack of mental capacity.
The circuit court granted Jones's motion for a directed verdict. From the bench, the circuit court explained that "there's no evidence of procurement," as Montigue testified that Mr. Graham did not "sign anything that he didn't want to sign," and "if anything, [Jones] was a mere courier between her Dad and Mr. Walters." The court also "did not find that a fiduciary relationship existed" from the "mere presence of [a] power of attorney [that] was executed back in 2008[.]" The court found that to be so "especially when [the power of attorney] is prepared by an attorney" and in this case, "Mr. Walters was an upstanding member of this Bar" and "had the ability to do estate planning and meet with his clients." Additionally, the circuit court found that there was "no evidence," in any event, "that Ms. Jones ever used the power of attorney."
As to whether Montigue carried her burden of proving undue influence, the circuit court decided, based on testimony that "Mr. Walters was a close friend, confidant, and lawyer of Freddie Graham," that he "would not have permitted his friend and client to be influenced." Indeed, the circuit court observed that "[i]f Mr. Walters thought Ms. Jones was procuring assets for her benefit," he "would have put a stop to it, just like he told Ms. Jones in a phone conversation that you can't tell a man how to spend his money." The circuit court also found that there "was no evidence in this case of a mental incapacity, any mental incompetence, [or] any psychological problems."
Shortly after the conclusion of the trial, Montigue filed a motion requesting that the circuit court make specific findings of fact and conclusions of law pursuant to Ark. R. Civ. P. 52(a) (2018). The circuit court denied the motion and entered a written order that memorialized its directed-verdict ruling from the bench, denied Montigue's petition for declaratory judgment, and granted Jones's counterclaim for a declaratory judgment.
Montigue now appeals the circuit court's order, arguing, inter alia , that the circuit court erred by finding insufficient evidence to shift the burden of proof to Jones. Montigue argues, in particular, that she introduced sufficient evidence of procurement, as well as a confidential relationship between Jones and Mr. Graham, to warrant shifting to Jones the burden of producing evidence that Mr. Graham had the mental capacity and free will to execute the documents transferring his property. We agree.
II. Standards of Review
This court reviews equity proceedings de novo, but it will not reverse a finding of fact by the circuit court unless it is clearly erroneous. Griffith v. Griffith , 2018 Ark. App. 122, at 7, 545 S.W.3d 212, 216. A finding is clearly erroneous when, although there is evidence to support it, this court is left on the entire evidence with the firm conviction that a mistake was *56 made. Id. The court generally defers to the superior position of the circuit court to weigh the credibility of the witnesses. Id.
A different standard may apply when, as here, a circuit court grants a motion for a directed verdict or a motion to dismiss at the conclusion of a petitioner's case. In those instances, the circuit court's duty is to decide "whether, if it were a jury trial, the evidence would be sufficient to present to the jury." Stanley v. Burchett , 93 Ark. App. 54, 58, 216 S.W.3d 615, 618 (2005). "A motion for a directed verdict should be granted only if there [would be] no substantial evidence to support a jury verdict." Woodall v. Chuck Dory Auto Sales, Inc. , 347 Ark. 260, 264, 61 S.W.3d 835, 838 (2001) (internal citation omitted). "In making that determination, the trial court does not exercise fact-finding powers that involve determining questions of credibility." Stanley , 93 Ark. App. at 58, 216 S.W.3d at 619. Moreover, in determining whether the circuit court should have granted the motion, this court "review[s] the evidence in the light most favorable to the party against whom the verdict is sought and gives it its highest probative value, taking into account all reasonable inferences deducible from it." Woodall , 347 Ark. at 264, 61 S.W.3d at 838. "Where the evidence is such that fair-minded persons might reach different conclusions ... the directed verdict should be reversed." Id.
III. Discussion
A. Procurement and Confidential Relationship
Montigue first argues that the circuit court erred by ruling that she failed to come forward with sufficient evidence of procurement and confidential relationship in order to shift the burden of producing evidence of mental capacity and lack of undue influence to Jones. Because we agree that the circuit court erred by granting the motion for directed verdict, we reverse and remand the case for further proceedings.
For the sake of clarity, we first address a preliminary matter. While the existence of a fiduciary relationship, vel non, is not dispositive in this case, it is noteworthy here that the circuit court erred when it concluded that the durable power of attorney did not create such a relationship between Mr. Graham and Jones. "A person who holds power of attorney is an agent, and it has long been recognized that a fiduciary relationship exists between principal and agent in respect to matters within the scope of the agency." Dent v. Wright , 322 Ark. 256, 261, 909 S.W.2d 302, 304 (1995). As we indicate above, on December 8, 2008, Mr. Graham executed a durable power of attorney that, among other things, gave Jones "full and complete power and authority in the premises to do, say, act, transact, and perform each and every act necessary in the management of [his] affairs and [his] estate[.]" Montigue correctly argues, therefore, that the circuit court erred when it concluded that "[n]o fiduciary relationship existed" between Mr. Graham and Jones on matters regarding his estate.
Turning to the issues at hand, a party seeking to set aside a deed ordinarily has the burden of proving by a preponderance of the evidence that the grantor of the deed lacked mental capacity at the time the deed was executed or that the grantor acted under undue influence. See Estate of McKasson v. Hamric , 70 Ark. App. 507, 510, 20 S.W.3d 446, 449 (2000). A rebuttable presumption of undue influence or lack of mental capacity arises, however, upon a showing that the grantee procured the deed while in a confidential relationship with the grantor. See *57 Hamric , 70 Ark. App. at 511, 20 S.W.3d at 449 ; see also Myrick v. Myrick , 339 Ark. 1, 6, 2 S.W.3d 60, 64 (1999) (a transfer to the dominant party in a confidential relationship raises a presumption of undue influence). In that instance, the grantee must go forward with evidence that the grantor possessed both the required mental capacity and freedom of will. See Hamric , 70 Ark. App. at 510, 20 S.W.3d at 448. However, the burden of proof, in the sense of the necessity to prove lack of mental capacity or undue influence by a preponderance of the evidence, remains with the party challenging the deed. See Hodges v. Cannon , 68 Ark. App. 170, 177, 5 S.W.3d 89, 95 (1999).
"Procurement," which originally meant that the grantee of a deed wrote the instrument himself, has been extended to situations in which the grantee caused the deed to be prepared and participated in its execution. See Hamric , 70 Ark. App. at 510, 20 S.W.3d at 448. Further, "[t]here is no set formula by which the existence of a confidential relationship may be determined, for each case is factually different[.]" Lucas v. Grant , 61 Ark. App. 29, 34, 962 S.W.2d 388, 390 (1998). A confidential relationship is not established simply because parties are related, Wesley v. Estate of Bosley , 81 Ark. App. 468, 475, 105 S.W.3d 389, 394 (2003), but other factors, such as a showing of special trust and dependence, may combine with a familial connection to create a confidential relationship. In particular, a confidential relationship may arise "between a person who holds power of attorney and the grantor of that power." Medlock v. Mitchell , 95 Ark. App. 132, 136, 234 S.W.3d 901, 905 (2006).
As we note above, the property under dispute includes the minerals and mineral rights that were transferred via the beneficiary deeds that Mr. Graham executed in 2008; Mr. Graham's twenty-three-acre property in Lavaca; and the personal property that was transferred via the bills of sale that Mr. Graham executed shortly after his stroke in 2011. With the above standards in mind, we discuss each disputed item of property in turn.
1. The minerals and mineral rights
Contemporaneously with the durable power of attorney, Mr. Graham executed several beneficiary deeds that transferred minerals and mineral rights to Jones upon his death. There was no testimony at the hearing, however, regarding the circumstances surrounding the execution of those deeds, let alone whether Jones procured them. Therefore, the circuit court did not err when it determined that Montigue's evidence did not warrant shifting the burden of production with respect to the mineral deeds.
2. The twenty-three acres in Lavaca
The twenty-three acres that Mr. Graham transferred, or purported to transfer, by deed in 2011, however, is another matter. Montigue introduced evidence to warrant shifting the burden of production with respect to the last warranty deed that Mr. Graham executed after his stroke in 2011. The durable power of attorney that Mr. Graham executed in 2008, along with Jones's testimony that she had "exclusive control" of her father after his stroke, was sufficient, in our view, to demonstrate that she and her father were in a confidential relationship. There also was evidence of procurement, as Jones's testimony established that she advised her father to transfer the property to her to avoid its seizure by the government, called Mr. Walters to arrange the drafting of the deed, drove her father to Mr. Walters's office on the day of its execution, and was present when her father signed the deed. Consequently, we reverse the *58 circuit court's directed-verdict ruling and remand the case for further proceedings.
3. The bills of sale
For similar reasons, we hold that the circuit court erred when it concluded that there was "no evidence of procurement" warranting a presumption that Mr. Graham lacked the mental capacity and free will to execute the bills of sale. There was some evidence that Jones procured those documents, as she testified on direct examination that she called Mr. Walters to have them drafted. Mr. Graham also executed the documents in 2011 when, for the reasons we discuss above, he and Jones were in a confidential relationship. Accordingly, we hold that the circuit court erred by finding there was no evidence of procurement and confidential relationship to warrant shifting the burden of production with respect to the real and personal property that Mr. Graham purportedly transferred in 2011.
B. Judicial Notice
Montigue additionally argues that the circuit court erred by taking judicial notice of Bill Walters's reputation in the legal community and concluding, based on that alleged reputation, that Mr. Walters "would have put a stop" to Jones's procuring assets for her benefit or exercising undue influence on her father. According to Montigue, Mr. Walters's reputation is not the kind of fact that can be judicially noticed under Ark. R. Evid. 201(b) (2018) because it is "subject to reasonable dispute" and incapable of "accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." We decline to reach the issue because Montigue failed to preserve this argument for appellate review with an appropriate objection below.
Arguments not raised at trial will not be addressed for the first time on appeal, Goodson v. Bennett , 2018 Ark. App. 444, at 13, 562 S.W.3d 847, 857, and Montigue never argued below, as she does here, that the circuit court erred by taking judicial notice of Mr. Walters's reputation under Ark. R. Evid. 201. She made no objection after the court made its comments from the bench, and neither Montigue's motion for findings of fact and conclusions of law nor her letter objecting to the form of the proposed order preserve the issue for appellate review, as she claims. Accordingly, we must affirm.
C. Leading Questions on Direct Examination
Montigue additionally argues that the circuit court erred when it refused to allow her to ask Jones-the adverse party-leading questions on direct examination. Because the circuit court may well hear additional testimony on remand, we take the opportunity to address the issue here.
Arkansas Rules of Evidence 611(c) provides, "[W]henever a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." Montigue called Jones, the adverse party, to testify as a witness during her case-in-chief. Therefore, according to the plain language of Rule 611(c), the circuit court erred when it ruled that Montigue was not entitled to ask leading questions of Jones.
D. Findings of Fact and Conclusions of Law
Finally, Montigue argues that the circuit court erred when it denied her motion for more specific findings of fact and conclusions of law pursuant to Ark. R. Civ. P. 52(a). We decline to reach this issue because we anticipate that the challenged *59 findings will be superseded by new findings of fact and conclusions of law after further proceedings on remand.
IV. Conclusion
We hold that there was sufficient evidence of procurement and a confidential relationship between Jones and Mr. Graham to warrant shifting to Jones the burden of producing evidence that Mr. Graham had the mental capacity and free will to execute the bills of sale and the last warranty deed that he executed in 2011. Accordingly, we reverse and remand the case to the circuit court for further proceedings consistent with this opinion.
Reversed and remanded.
Virden and Whiteaker, JJ., agree.

Although we are reversing and remanding the case, we take this opportunity to remind the parties that Ark. Sup. Ct. R. 4-2(a)(5) (2018) limits abstracts to information that "is essential for the appellate court to confirm its jurisdiction, to understand the case, and to decide the issues on appeal." Rule 4-2(a)(5)(B) likewise prohibits the abstract from "reproduc[ing] the transcript verbatim." The appellant's abstract, which begins with a twenty-six-page transcription of a marginally relevant pretrial hearing, does not comply with these rules.